IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 6, 2011 Session

## YDALE BANKS v. STATE OF TENNESSEE

Appeal from the Criminal Court for Shelby County
No. 96-06381     John T. Fowlkes, Judge

No. W2010-01610-CCA-R3-PC  - Filed March 27, 2012

The petitioner, Ydale Banks, appeals the denial of his petition for post-conviction relief from his convictions for first degree felony murder, first degree premeditated murder, conspiracy to commit first degree premeditated murder, especially aggravated burglary, facilitation of especially aggravated robbery, three counts of especially aggravated kidnapping, and three counts of aggravated assault.  He argues that:  (1) the post-conviction court erred in finding that he was not prejudiced by the instructions submitted to the jury that contained the trial court's handwritten corrections; (2) the post-conviction court erred in determining that he received the effective assistance of counsel at trial and on appeal; and (3) the post-conviction court erred in not granting a new trial due to cumulative error.  After review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Joseph S. Ozment, Memphis, Tennessee, for the appellant, Ydale Banks.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Rachel Newton, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### <u>FACTS</u>

The petitioner was convicted of first degree felony murder, first degree premeditated murder, conspiracy to commit first degree felony murder, conspiracy to commit first degree

premeditated murder, especially aggravated burglary, facilitation of especially aggravated robbery, three counts of especially aggravated kidnapping, and three counts of aggravated assault by a Shelby County Criminal Court jury. On direct appeal, this court affirmed the judgments of the trial court with the exception of the petitioner's conviction for conspiracy to commit felony murder, which it reversed. The Tennessee Supreme Court denied his application for permission to appeal. See State v. Ydale Banks, No. W2000-00963-CCA-R3-CD, 2004 WL 1686868 (Tenn. Crim. App. July 28, 2004), perm. to appeal denied (Tenn. Jan. 24, 2005). The underlying facts of the case were recited by this court on direct appeal as follows:

> The convictions now under review emanated from events of August 12, 1995, which resulted in the death of Dorothy Webber, a 47-year-old nurse and beauty shop operator. The victim resided with her husband, Leslie B. Webber, Sr., and on the night of August 12, 1995, her son, Leslie B. Webber, Jr., was staying at her residence.
>
> The victim's son testified that, on that night, he awakened to discover a female standing in the hallway. She held a revolver and told the younger Webber that he was "supposed to be asleep." A male intruder then entered the room, held a pistol to the younger Webber's head, and tied his hands with a vacuum cleaner cord. The intruders wore beige pants, white shirts, and white caps. The shirts and caps bore "Krispy Kreme Doughnut" logos. The younger Mr. Webber heard the voice of a third intruder, a male.
>
> At one point, a male intruder placed a pillow over Mr. Webber's head, and Mr. Webber heard someone ransacking his room. He testified that the intruders asked where the money was, and Mr. Webber replied there was no money in the house. Mr. Webber heard the intruders addressing the elder Mr. Webber in the family den and telling him that the intruders were taking his wife, the victim, with them. When the younger Mr. Webber untied himself and went into the den, the intruders were gone, and he found his father handcuffed, dazed, and with a knot on his head. Both the victim and the victim's car, a Toyota Camry, were gone. The younger Mr. Webber testified that the intruders had entered the house by posing as Krispy Kreme employees selling or giving away doughnuts. A box of doughnuts was left behind in the den.
>
> Approximately ten days later, the victim's body was found in a field in a rural area in Mississippi. Her hands had been cuffed behind her back, and duct tape had been wrapped around her head. The medical examiner testified

-2-

that the victim had died between August 13 and 16; she had suffocated as a result of the tape across her mouth and nose.

Several weeks after the body was discovered, Memphis Police Officers interviewed the [petitioner] about the home invasion and the death of the victim. In the resulting statement, the [petitioner] admitted that he had been involved in the planning of a robbery or kidnapping. Three other men, a woman, and the [petitioner] believed that a second son of the Webbers, Kevin Webber, was a drug dealer who had amassed $300,000 in cash. The cabal of five decided three of them would gain entry to the Webber house by posing as Krispy Kreme employees. They purchased white shirts and caps and arranged to have Krispy Kreme logos affixed. The group talked about kidnapping the victim as a means of extracting a $300,000 ransom payment from Kevin Webber, should the money not be found in the elder Webbers' house. The [petitioner] waited in a vehicle while three of his associates entered the house. After about fifteen minutes, the intruders emerged from the Webbers' garage in the victim's Camry; the victim was in the backseat. In his statement, the [petitioner] stated that the group took the victim to a room in the Elvis Presley Inn. Later, they took her to a tire shop to which they had access; they kept her there throughout the night. On the following morning, they placed the victim inside a U-Haul truck, and the [petitioner] drove the truck into Mississippi, where he backed it into a field. According to the [petitioner]'s statement, two of the other men removed the still-conscious victim from the truck and left her in the field. The victim was not "supposed to die."

Following guilty verdicts on the various charged offenses and faced with the state's quest for the death penalty, the lower court conducted a jury hearing on the issue of penalty on the murder convictions. The victim's mother testified that the loss of her daughter "meant everything to [her] because [she did not] have her any more, and . . . [would not] see her anymore." She testified that the victim was "the love of the family and everybody loved her." Following this testimony, the state introduced photographs of the victim's body taken at the scene and in the morgue.

The [petitioner]'s sisters testified in his behalf. One testified that the [petitioner] is a "valuable asset to [his] family" and is loved by them. She testified that the [petitioner] had a six-year-old daughter, with whom he maintained a close relationship despite his incarceration. The other sister affirmed the family's affection for the [petitioner] and testified that the

[petitioner] had always held a job and did so until he was incarcerated. She testified that he was skilled as a cook.

The mother of the [petitioner]'s daughter testified that the [petitioner] worked very hard and aspired to be a chef. She testified that the [petitioner] had a strong bond with his daughter and provided well for her financially. Despite the [petitioner]'s incarceration, he remained close to his daughter.

Id. at *1-3.

The petitioner filed a petition for post-conviction relief, a supplemental petition, and then four "amended and superseding" petitions, in which he raised, among other things, allegations of ineffective assistance of counsel and allegations concerning the legibility of the jury instructions. The court conducted an evidentiary hearing on the matter, at which the petitioner testified that counsel failed to obtain a written or oral ruling on his motion to suppress.[1] The petitioner complained that the trial judge fell asleep during the prosecutor's cross-examination of him and had to be aroused by the court reporter. He recalled that the trial judge said that "he would halt the proceedings right there and order the transcripts of the part that he missed and we would come back in at a later date and finish up the rest of the hearing." The petitioner admitted that the judge was awake during the testimony from the police officers and arguments from the attorneys, so he was unsure of how long the judge was asleep. The petitioner explained that the judge was inattentive throughout the hearing and at times during trial due to his television show schedule. The petitioner said that counsel never made an objection on the record regarding the trial judge's falling asleep at the suppression hearing. Other than the two issues concerning the motion to suppress, the petitioner had no other complaints concerning counsel's performance during trial.

The petitioner next discussed his complaints concerning the jury instructions. He stated that the trial court submitted instructions to the jury that contained the court's handwritten corrections, additions, and deletions, rather than providing the jury with a clean copy of the instructions. In particular, the court had omitted two of the charges against the petitioner and wrote those in with "an arrow to the rest of the indictment numbers as to where they should have been placed." He claimed that the handwriting was difficult to read. He acknowledged that counsel raised the issue on appeal but stated that the appellate court determined that the issue was waived because it had not been raised in the motion for new trial. He also testified that the trial court failed to charge the jury with any lesser-included offenses of felony murder. He stated that counsel argued to the trial court that certain lesser-

_____

[1] We limit the majority of our recitation of the testimony from the evidentiary hearing to that relevant to this appeal.

included offenses should be included, but the court refused to include anything other than facilitation. He said that the court also did not charge voluntary manslaughter as a lesser-included offense of premeditated first degree murder. He also complained about the definition of "reasonable doubt" that was included in the jury instructions.

The petitioner next complained about the jury deliberations and the hours the jury worked. In particular, the day the verdicts were returned in both the guilt and penalty phases, the jury worked from 8:00 a.m. until 1:00 a.m. the following morning. The sentencing hearing did not begin until 9:00 or 10:00 p.m. after the jury had deliberated on his guilt the entire day. The petitioner recalled that, at one point prior to the jury returning a verdict in the sentencing portion of his trial, the prosecutor and counsel jointly approached the trial judge and asked him to declare a mistrial, but the judge indicated that "he had to let them stay back there until they c[a]me up with a decision."

The petitioner also testified that his mother was not allowed to testify on his behalf at the sentencing hearing. He explained that his mother had an asthma attack and passed out as she was about to take the stand, and the trial court would not grant a recess to allow her to testify.

Gloria Banks, the petitioner's mother, testified that counsel tried unsuccessfully to get a recess after her asthma attack so she could testify at the sentencing hearing. If she had been given the opportunity to testify, she would have testified that the petitioner was a good child and had held a job since the time he was able. She said that the petitioner loved and cared for his daughter.

Counsel testified that, during the suppression hearing, the attorneys and court staff noticed that the trial judge had fallen asleep. The incident occurred sometime during the cross-examination of the petitioner, after testimony from the two State's witnesses and the direct examination of the petitioner. During the commotion created by the attorneys trying to decide what to do, the judge woke up. Counsel acknowledged that the judge said he would review the transcript from the portion of the testimony he missed, but the judge would not be able to ascertain the demeanor of the witness. Counsel testified that he thought there had been a final ruling on the motion to suppress, and he would not have proceeded without a ruling as the petitioner's statement "was the big key to this whole trial." It was his understanding that the motion was denied, but he did not believe there was a written ruling.

Counsel testified that, during the course of trial, the jury was oftentimes left waiting in the jury room for hours until the trial judge arrived. He said that the jury arrived first thing in the morning but that court did not start until late afternoon and continued late into the night. He recalled that, the day before the verdict, the jury received the charge and then

decided at 8:00 p.m. that it wanted to have dinner and start deliberations in the morning. The jury deliberated the entire next day, returning a verdict after dinner, and then the trial court started the sentencing hearing. Counsel recalled that the attorneys approached the judge in chambers about the late hours and requested a mistrial, and the judge told them that "[the jury was] going to deliberate until [they were] finished tonight and that's just it." Counsel noted that he billed nineteen hours in trial that day. In addition, counsel noted that the trial judge "dozed off" several times during trial.

Counsel testified that the attorneys and trial court had a lengthy discussion about the jury charge prior to the court's instructing the jury. During that discussion, several corrections and changes were made to the court's initial charge. He assumed, as was normal practice, that the trial court gave the jury a "clean copy" of the instructions after the corrections and changes were made and read to the jury. It was not until he received the appellate record that he learned the jury had been given a copy of the instructions that contained the trial court's handwritten notations and corrections. Therefore, he raised the issue as plain error on appeal. Counsel felt that the instructions, as submitted, were difficult to follow and, had he known they were submitted to the jury in that fashion, he would have objected.

When asked why he did not raise as an issue on appeal the long hours worked by the jury, counsel stated that his strategy when preparing an appeal was to submit only the strongest arguments to the court. Counsel also testified that the petitioner's mother was preparing to testify when she passed out, and she never ended up being able to testify.

On cross-examination, counsel acknowledged that the appellate court reviewed the testimony from the suppression hearing and affirmed the denial. He again stated that, although he should have gotten a written ruling on the motion to suppress, he was informed that the motion was denied. He also explained again that he only raises the issues on appeal that he believes to be the strongest and that he goes through the entire trial record in making that determination.

The assistant district attorney who prosecuted the petitioner testified that he remembered the trial judge "conduct[ing] a very professional courtroom." When questioned whether he remembered the trial judge falling asleep during the suppression hearing, the prosecutor said that he did not recall that happening and he "was unaware of it" if the judge did. Concerning the long hours of jury deliberation, the prosecutor testified that he remembered the lawyers talking amongst themselves about how long the judge was going to allow the jury to work, but they were informed by the judge that the jurors "wanted to continue to work[.]"

Donna Murray, an employee of counsel's law firm, testified that she was present for the petitioner's suppression hearing and trial. Murray recalled that the trial judge was "fighting sleep . . . a lot of the hearing"and "kept nodding off and catching himself" during the petitioner's testimony. She recalled that the judge actually fell asleep at one point and had to be woken by one of his clerks but said that he was asleep for "less than a minute." Murray acknowledged that the trial judge requested a transcript of the sentencing hearing. Murray also remembered that the trial judge took a long break in the middle of the trial to conduct a television interview with Geraldo Rivera. She said that the hours of the trial were "[v]ery long" and that the jury arrived early in the morning but had to wait until the afternoon for the trial to resume. She recalled that the sentencing portion of the hearing went until 2:00 or 2:30 a.m., and the jury did not eat that night. She said that the attorneys asked the judge for a mistrial, but the judge indicated that "[h]e wanted a verdict."

After the conclusion of the hearing and argument from the parties, the post-conviction court entered a thorough order denying post-conviction relief.

## ANALYSIS

The petitioner argues that: (1) the post-conviction court erred in finding that he was not prejudiced by the instructions submitted to the jury that contained the trial court's handwritten corrections; (2) the post-conviction court erred in determining that he received the effective assistance of counsel at trial and on appeal; and (3) the post-conviction court erred in not granting a new trial due to cumulative error.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

-7-

## I. Jury Instructions

The petitioner first argues that the post-conviction court erred in finding that he was not prejudiced by the "confusing and illegible jury instructions that were submitted to the jury." He asserts the instructions "[a]t best . . . look like a rough draft," consisting of "a quagmire of delineations and notations[.]"

Rule 30(c) of the Tennessee Rules of Criminal Procedure provides, "[E]very word of the judge's instructions shall be reduced to writing before being given to the jury." Tenn. R. Crim. P. 30(c). However, failure to follow this rule, although error, is not reversible unless it "more probably than not affected the judgment." Tenn. R. App. P. 36(b); State v. Gorman, 628 S.W.2d 739, 740 (Tenn. 1982). It is not error for part of the charge to be handwritten while the remainder is typewritten unless it falls to the level of the writing described in Pedigo v. State, 236 S.W.2d 89, 90 (Tenn. 1951), of "contain[ing] incompetent and irrelevant matter, illegible interlineation and meaningless annotations [that] might as well have been written in a foreign language and could serve no purpose except to confuse the jury." State v. Tyson, 603 S.W.2d 748, 754-55 (Tenn. Crim. App. 1980). The form of the instructions is not as important as their content. See State v. Cravens, 764 S.W.2d 754 (Tenn. 1989) (holding that the reversal in State v. Martin, 702 S.W.2d 560 (Tenn. 1985), was for the content of the instructions, not the form, and that the form of the instructions in that case, although not as clear as directed by Martin, did not warrant reversal).

In challenging the jury instructions in the present case, the petitioner relies on Pedigo, 236 S.W.2d 89 and Adcock v. State, 236 S.W.2d 88 (Tenn. 1949), as well as distinguishes his case from State v. Hodges, 7 S.W.3d 609 (Tenn. Crim. App. 1998) and State v. Jason Thomas Beeler, No. W1999-01417-CCA-R3-CD, 2000 WL 1670945 (Tenn. Crim. App. Nov. 2, 2000).[2] He asserts that the instructions given by the trial court contained "multiple alterations that are illegible and rendered potentially meaningless in some parts, if nothing else due to the confusing manner in which the deletions and additions were made with lines, arrows, brackets and writing sideways along the margins of some pages."

In Pedigo, our supreme court found that the charge provided to the jury contained "incompetent and irrelevant matter, illegible interlineation and meaningless annotation," such that it was unacceptable and required reversal of the petitioner's conviction. 236 S.W.2d at 90. The court observed that the charge "might as well have been written in a foreign language and could serve no purpose except to confuse the jury." Id. The court noted that it was a fair inference that the jury was confused and not clearly instructed since it returned a verdict convicting the defendant as an "accessory" when neither the indictment

---

[2] The Beeler opinion was designated "not for citation" by our supreme court.

nor the evidence supported such a finding. Id.

In Adcock, the trial court delivered part of the jury charge orally and ex tempore and then read part of the charge from a typewritten form which contained not only points of law applicable to the case, but also many points of law that were inapplicable and confusing. 236 S.W.2d at 88. In reading from the form, the trial judge read only the parts that were appropriate, but then handed the jury the entire typewritten form which it took into the jury room. Id. at 88-89. In determining that the manner in which the jury instructions were given mandated reversal, our supreme court noted that the jury was charged on "much law that had no application to the facts of this case" as well as "given instruction on many facts which were not in evidence and were contrary to the theory of the [d]efendant." Id. at 89.

In Hodges, this court found that the trial court's inclusion of "a single irrelevant instruction" with "no illegible interlineation and no meaningless annotation" did not rise to the magnitude of impropriety in Pedigo and Adcock. 7 S.W.3d at 628-29. We concluded that no reversible error had occurred. Id. at 629.

In Beeler, the defendant complained that the written instructions given to the jury were totally confusing and prejudicial because, rather than retyping the instructions, the trial court crossed out inapplicable passages and sections. 2000 WL 1670945, at *30. This court reviewed the written instructions that were provided to the jury and noted that they consisted of a series of printed, pattern instructions that referenced various sections of the Tennessee Criminal Pattern Jury Instructions and that, on ten of the printed pages, the trial court had crossed out certain language that consisted mostly of definitions and elements of the offenses that did not apply. Id. at *31. The trial court instructed the jury to ignore the crossed-out sections, and this court concluded that there was no indication that the jurors did not follow the instructions. Id. This court observed that giving the jury written instructions with blackened-out portions was "risky" but determined that there was no prejudicial error in that case. Id.

In ruling on this issue, the post-conviction court noted that the trial court informed the jury that certain interlineations had been made to the charge but did not instruct the jury regarding the crossed-out portions of the charge. The court also noted that all but thirty-two of the one hundred and two pages of instructions provided to the jury had some type of handwritten alteration, of most concern being the first page "which superimpose[d] by hand two deleted indictments and the lesser included offenses which were to be considered by the jury." The court found that, although legible, the manner in which the instructions were imposed was potentially confusing but that any confusion was likely corrected by "an appropriate charge as to the verdict pages and the appropriate order of consideration for lesser included offenses as to each charge."

The court observed that the instruction on facilitation of a felony contained "major handwritten interlineations" but was a complete and correct statement of the law at the time of trial. The court was concerned that some of the portions of the charge being "bracketed, circled, or underlined with no instruction to the jury about such notations" might have drawn undue emphasis to those portions of the charge. However, the court concluded that the instructions in this case fell more in line with those given in Beeler that were determined to be non-prejudicial, rather than those given in Adcock and Pedigo.

After our review, we conclude that the record supports the post-conviction court's determination. Although it would have been preferable for the jury to have a cleaner copy of the instructions, the handwritten instructions were legible and not "meaningless." Moreover, the instructions were read, as corrected, to the jury prior to deliberations. Therefore, the jury would have heard the correct instruction prior to reading the copy provided to them. Furthermore, the court did instruct the jury that interlineations had been made to the charge. The petitioner has failed to prove that the jury was unable or failed to follow the instructions or, accordingly, any prejudicial error.

## II. Ineffective Assistance of Counsel

The petitioner next raises several allegations of ineffective assistance of counsel. He argues that counsel rendered ineffective assistance by failing: (1) to object and preserve the record regarding the trial judge's sleeping and general demeanor during the suppression hearing; (2) to obtain a written ruling from the trial court on the petitioner's motion to suppress; (3) to properly preserve his objections to the late night jury deliberations and raise the issue on appeal; (4) to review the jury instructions after the court made "delineations and additions" and challenge the form of the jury instructions in the motion for new trial; (5) to object to improper statements made by the prosecutor in closing argument; (6) to challenge the trial court's failure to charge certain lesser-included offenses and raise the issue on appeal; and (7) to object to the jury instruction on reasonable doubt.[3]

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is

---

[3] We have combined the petitioner's issues that rely on the same argument and/or that are logically addressed together.

applied in federal cases also applies in Tennessee).  The <u>Strickland</u> standard is a two-prong test:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment.  Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms."  <u>Goad v. State</u>, 938 S.W.2d 363, 369 (Tenn. 1996) (citing <u>Strickland</u>, 466 U.S. at 688; <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, <u>see</u> <u>Strickland</u>, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation.  <u>See</u> <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982).  The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.  The same principles apply in determining the effectiveness of trial and appellate counsel.  <u>Campbell v. State</u>, 904 S.W.2d 594, 596 (Tenn. 1995).

## A.  Trial Judge's Sleeping and General Demeanor

The petitioner argues that counsel rendered ineffective assistance by failing to object and preserve the record regarding the trial judge's sleeping during the suppression hearing as well as the judge's general demeanor.[4]  He asserts that "justice should never sleep . . . and that trial counsel[']s failure to properly preserve the issue and the sleeping itself results in per se prejudice to a defendant."

---

[4] The petitioner also argues that counsel was ineffective for failing to preserve the record regarding the trial judge's general "demeanor," but he does not provide any argument in support of that assertion and simply refers to his argument regarding the judge's sleeping.

With regard to this issue, the post-conviction court found that there was testimony at the evidentiary hearing from the petitioner, counsel, and counsel's assistant that the trial judge fell asleep for "an extremely brief period of time" during the cross-examination of the petitioner but that such testimony was controverted by the prosecutor, who testified that he did not remember such incident. Nevertheless, the post-conviction court observed that the trial judge appeared to have acknowledged that his attention briefly lapsed during a portion of the suppression hearing. The court noted that both counsel and the court took appropriate steps to mitigate any potential prejudice to the petitioner and, even though the better course may have been for counsel to record the incident for the record, the petitioner did not demonstrate that the trial court's determination on the motion to suppress or the appellate court's decision on the issue would have been different.

After review, we conclude that the record supports the post-conviction court's determination. As noted by the post-conviction court, the trial judge reviewed the transcript from the hearing, including the "10, 15 seconds . . . that [the judge] lapsed on," prior to issuing his ruling and allayed counsel's concerns about judging the petitioner's demeanor as a witness. Moreover, this court reviewed the entire testimony presented at the suppression hearing and upheld the trial court's denial of the petitioner's motion to suppress. See Ydale Banks, 2004 WL 1686868, at *3-6. Therefore, even if counsel was deficient for failing to object and preserve the issue for the record, the fact that this court reviewed the testimony from the suppression hearing and affirmed the trial court's denial of the motion to suppress precludes the petitioner from establishing that he was prejudiced by any inaction by counsel.

## B. Written Ruling on Motion to Suppress

The petitioner argues that counsel rendered ineffective assistance for failing to obtain a written order from the trial court on the motion to suppress. He asserts that "[i]t would have been interesting to see what such a ruling would have said, especially in light of the fact that the trial judge fell asleep."

As to this issue, the post-conviction court found that counsel was not ineffective in failing to obtain a final written ruling on the motion to suppress. The court noted that counsel testified that he received pretrial notice that the motion was denied even if he did not request a written order. The court also noted that the appellate court, after a full review, concluded that the evidence supported the trial court's determination that the petitioner's confession was freely and voluntarily given. Accordingly, the court found that, even if counsel was deficient in failing to request a written order, the petitioner failed to demonstrate any prejudice because "it is unlikely that either the trial court or the appellate court would have reached a different conclusion."

-12-

We conclude that the record fully supports the post-conviction court's determination. As noted previously, this court thoroughly reviewed the denial of the motion to suppress on direct appeal and affirmed the denial. Therefore, the petitioner has not and cannot show that he was prejudiced by the absence of such written order.

### C. Late-Night Jury Deliberations

The petitioner argues that counsel rendered ineffective assistance for failing to properly preserve his objection to the late-night jury deliberations and for failing to raise the issue on appeal. He asserts that the late hours worked by the jury were prejudicial to him.

According to the trial record, the jury was instructed on the guilt phase of trial on February 3, 2000. After the charge, the jury informed the court that it wanted to eat dinner and begin deliberations the next morning. Therefore, the jury was adjourned at 7:25 p.m. The jury began deliberating on the guilt phase at 8:15 a.m. on February 4 and rendered its verdicts at 5:30 p.m. After almost a two-hour recess, the sentencing phase of the petitioner's trial started at 7:40 p.m. The sentencing phase concluded and jury deliberations began at 10:10 p.m. The jury returned with its sentence at 2:05 a.m. on February 5.

With regard to this issue, the post-conviction court found that counsel performed deficiently because he should have made a formal objection that the jurors "were no longer alert enough to both concentrate on the proof . . . or alert enough to give proper consideration to the appropriate sentencing verdict." However, the court concluded that there was no prejudice because the jury deliberated for four hours and returned with a verdict of life without the possibility of parole, rather than death, despite the State's presentation of "graphic testimony in support of [its] one aggravating circumstance, that the murder was especially heinous, atrocious or cruel" and the petitioner's presentation of "limited mitigation regarding his family's affection for him and his work history."

Initially, we disagree with the post-conviction court's conclusion that counsel preformed deficiently. The prosecutor testified that the trial court informed them that the jury "wanted to continue to work[.]" In addition, there was no evidence offered that the jury was no longer alert enough to concentrate on the proof and the deliberation process. The record shows that, on February 3, the jury communicated its wishes through the bailiff to not begin deliberations until the following morning; therefore, it is a reasonable inference that the jury would have likewise communicated its wishes on February 4 had it felt unalert enough to deliberate that evening.

In any event, we agree that the record supports the post-conviction court's determination regarding the petitioner's failure to show prejudice. As noted above, the State

presented "graphic testimony in support of [its] one aggravating circumstance, that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." In response, the petitioner presented "limited mitigation regarding his family's affection for him and his work history." Despite what appeared to be heavy proof in favor of the death penalty, the jury deliberated for four hours and imposed a lesser sentence. We cannot conclude that, but for counsel's failure to object at trial and raise the issue on appeal, the outcome would have been different.

## D. Review and Challenge Form of Jury Instructions

The petitioner argues that counsel rendered ineffective assistance for failing to review the jury instructions and challenge the form of the jury instructions in the motion for new trial. As to this issue, the post-conviction court found that counsel made a reasonable assumption that the suggested changes, additions, and corrections would be made in typewritten form, given that was the normal practice followed by the criminal court judges and their discussion took place "long before the charge was read to the jury." Accordingly, the court concluded that counsel was not deficient for failing to anticipate that the instructions would be given to the jury with the handwritten interlineations. However, the court found that counsel did perform deficiently in failing to review the instructions prior to filing the motion for new trial and raise the issue in such motion. In any event, the court found that the petitioner was not prejudiced by counsel's inaction as it already concluded earlier that the instructions "f[e]ll more closely in line with those cases in which the appellate courts have determined no reversible error occurred[.]"

We conclude that the record supports the post-conviction court's conclusion that counsel did not perform deficiently in failing to review the charge after changes were made and prior to them being submitted to the jury. Counsel had a copy of the instructions, had objected to certain instructions, and the court had ample time to make the corrections in typewritten form as was normal practice amongst the criminal court judges. As such, we cannot agree with the post-conviction court's conclusion that counsel's conduct fell below an objective standard of reasonableness in thereafter failing to review the instructions prior to the motion for new trial when counsel had been present to hear the instructions read, as corrected, to the jury and would have, therefore, had no reason to anticipate that the instructions were not given to the jury in clean form.

In addition, the record supports the post-conviction court's conclusion that the petitioner was not prejudiced by any deficiency. As thoroughly addressed earlier, the judge's handwritten instructions were legible and correct and accurate statements of the law. The instructions were read, as corrected, to the jury prior to deliberations. Therefore, the jurors would have heard the correct instruction prior to reading the copy provided to them.

In addition, the court did instruct the jury that interlineations had been made to the charge. Accordingly, the petitioner has failed to prove that he was prejudiced by counsel's failure to review the instructions before they were read to the jury and raise the issue in the motion for new trial.

### E. Prosecutor's Statements in Closing Argument

The petitioner argues that counsel rendered ineffective assistance by failing to object to "the prosecutors' repeatedly, improperly stating their own personal opinions to the jury both during the guilt and penalty phases of his trial."

We initially note that it appears that the petitioner abandoned this claim. It was contained in his initial petition for post-conviction relief but was not included in any of his subsequent petitions. He did not incorporate his initial filing by reference and specifically titled his subsequent petitions as "superseding." Moreover, the petitioner did not question counsel regarding, or present any proof concerning, this issue during the evidentiary hearing.

In any event, we will address the petitioner's claim in light of the fact that the post-conviction court reviewed it. As noted by the post-conviction court, "[the] petitioner has given the court no guidance, by way of reference to the trial record, as to when in the trial the alleged misconduct occurred or which specific statements of the prosecutor were objectionable." The post-conviction court reviewed the entire record and surmised which remarks by the prosecutor might possibly apply to the petitioner's allegations. On appeal, the petitioner again does not pinpoint which remarks by the prosecutor were improper. Instead, he only points to the prosecutor's remark in closing argument that the post-conviction court surmised he was challenging: when the prosecutor asked the jurors to view the case from the victim's perspective.

We conclude that, any possible deficiency notwithstanding, the petitioner has failed to prove how he was prejudiced by counsel's failure to object to the prosecutor's statement. In fact, the petitioner failed to provide any argument at all concerning how he was prejudiced. As found by the post-conviction court, this court concluded on appeal that there was sufficient evidence to support the petitioner's conviction for first degree murder and that "a rational jury could conclude that the duct tape, as applied to this victim, was 'done so willfully, deliberately, and intentionally to cause the victim's suffocation and death.'" The court noted that the petitioner confessed to being involved in the kidnapping and death of the victim, admitted to having detailed discussions with others concerning the plan to kidnap the victim, and left the victim gagged and bound in rural Mississippi. The post-conviction court concluded that the result of the proceeding would not have been different had counsel objected to the prosecutor's statement in closing argument. The record supports this

determination. The petitioner has failed to allege, and we fail to see, any possibility that the result of the trial would have been different had counsel objected to the prosecutor's statement.

## F. Lesser-Included Offenses

The petitioner argues that counsel was ineffective for failing to request that the trial court charge voluntary manslaughter as a lesser-included offense of premeditated first degree murder. He also argues that counsel should have pursued, in the motion for new trial and on appeal, the trial court's failure to charge lesser included offenses of felony murder.

In ruling on this issue, the post-conviction court reviewed the law concerning lesser-included offenses and noted that the trial court had charged the jury with "intermediate" or "buffer" offenses between the charge the petitioner asserts should have been given and the charge of which he was convicted. Therefore, the post-conviction court concluded that there was no prejudice in this case in light of the "posture of the appellate courts regarding the harmlessness of a trial court's failure to charge certain 'buffer' offenses[.]"

With regard to counsel's failure to pursue in the motion for new trial and on appeal the trial court's not charging any lesser-included offenses of felony murder, the post-conviction court found that counsel did not perform deficiently in not raising the issue in the motion for new trial because the supreme court decision in State v. Ely, 48 S.W.3d 710 (Tenn. 2001), addressing the lesser-included offenses of felony murder, was not released until almost a year after the motion for new trial was filed. However, the post-conviction court found that counsel performed deficiently in failing to raise the issue on appeal because the oral arguments in the petitioner's appeal did not take place for two years after the release of the Ely decision. In any event, the post-conviction court found that there was no prejudice because the jury had rejected the intermediate lesser-included offenses of premeditated murder, the petitioner's premeditated murder and felony murder convictions had been merged, and this court on appeal determined that the evidence was sufficient to support both convictions. Relying on this court's reasoning in a similar scenario addressed in State v. Marlon Marktavias Fitzgerald, No. W2001-03096-CCA-R3-CD, 2003 WL 261940, at *10 (Tenn. Crim. App. Feb. 7, 2003), perm. to appeal denied (Tenn. July 7, 2003), the post-conviction court concluded that the trial court's failure to charge lesser-included offenses of felony murder was harmless beyond a reasonable doubt because "the jury's intentions to convict the defendant of first degree murder was not altered by the trial court's failure to charge lesser included offenses to felony murder."

After review, we conclude that the record supports the post-conviction court's determinations. The trial court instructed the jury on the following lesser-included offenses

of first degree murder: facilitation of first degree murder, second degree murder, and facilitation of second degree murder, as well as reckless homicide, facilitation of reckless homicide, criminally negligent homicide, and facilitation of criminally negligent homicide. Based on the fact that the jury found the petitioner guilty of the greater offense and rejected the intermediate lesser-included offenses, any deficiency on counsel's part was harmless and precludes the petitioner from establishing prejudice. See State v. Banks, 271 S.W.3d 90, 126 (Tenn. 2008); State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002); State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998).

Moreover, the record supports the post-conviction court's analysis of counsel's failure to pursue as an issue in the motion for new trial and appeal the trial court's not charging lesser-included offenses of felony murder. We cannot conclude that counsel performed deficiently in failing to raise the issue in the motion for new trial because the relevant supreme court decision addressing the lesser-included offenses of felony murder was not released until almost a year after the motion for new trial was filed. In addition, we need not address whether counsel performed deficiently in failing to raise the issue on appeal, because the petitioner has failed to prove any prejudice caused by counsel's inaction. In a similar case, Fitzgerald, this court concluded that the trial court's failure to charge lesser-included offenses of felony murder was harmless beyond a reasonable doubt in light of the jury's convicting the defendant of felony murder and premeditated murder, after the jury was properly charged with lesser-included offenses of premeditated murder, and this court determined that there was sufficient evidence supporting both convictions. Upon our thorough review of the record in this case, we cannot conclude that there is any reasonable probability that the result of the petitioner's appeal would have been different had counsel challenged the trial court's failure to charge any lesser-included offenses of felony murder.

## G. Reasonable Doubt Jury Instruction

The petitioner argues that counsel rendered ineffective assistance for failing to object to the "moral certainty" portion of the reasonable doubt charge submitted to the jury. The petitioner cites to State v. Rimmer, 250 S.W.3d 12 (Tenn. 2008), a case released well after his trial and appeal, but does not support his claim with any argument and has therefore waived review of this issue. See Tenn. Ct. Crim. App. R. 10(b).

In any event, the post-conviction court, citing Rimmer, State v. Dellinger, 79 S.W.3d 458 (Tenn. 2002), and State v. Bush, 942 S.W.2d 489 (Tenn. 1997), noted that, "[a]lthough such language has been discouraged, numerous appellate courts have approved the pattern charge." Therefore, the court found that counsel was not ineffective in either objecting to the charge or raising a challenge to it in the motion for new trial.

We agree with the post-conviction court's determination. Although the "moral certainty" language has been discouraged, the courts have concluded that the jury instruction did not result in the denial of due process. See Rimmer, 250 S.W.3d at 31; Dellinger, 79 S.W.3d at 501-02; Bush, 942 S.W.2d at 520-21. Therefore, the petitioner has failed to show that counsel was deficient for not objecting to the charge or any resulting prejudice.

### III. Cumulative Error

The petitioner lastly argues that the post-conviction court erred in not granting him a new trial due to cumulative error. The petitioner is merely resubmitting the issues he has already presented, and we respectfully disagree with his assertion that he is entitled to a new trial based on cumulative error.

### CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of post-conviction relief.

_____
ALAN E. GLENN, JUDGE